## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, John Arruda, a Special Agent with Homeland Security Investigations, being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been so employed since September 2006.  I am currently assigned to the HSI Office of the Resident Agent in Charge, Allentown, Pennsylvania.  Previously, I was assigned to the HSI Philadelphia Office of the Special Agent in Charge from 2012 to 2022 and prior to that I was assigned to the HSI Seattle Office of the Special Agent in Charge from 2006 to 2012.  As part of my duties as an HSI agent, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2252(a) and 2252A.  I have observed and reviewed examples of child pornography (as defined in 18 U.S.C. § 2256).  I have participated in the execution of numerous search warrants, a number of which involved child exploitation and/or child pornography offenses.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251, 2252, and 2252A, and I am authorized by law to request a search warrant.

2.      This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the locations specifically described in **Attachment A** of this Affidavit, including the entire property located at 37 Winslow Drive, Atkinson, NH 03811 (the "SUBJECT PREMISES"), the content of electronic storage devices located therein, and two individuals—Michael J. Bordonaro and Joseph Bordonaro a/k/a

Guiseppe Bordonaro—located at the SUBJECT PREMISES, for contraband and evidence, fruits,

and instrumentalities of violations of

18 U.S.C. § § 2251, 2252, and 2252A, which items are more specifically described in

**Attachment B** of this Affidavit.

      3.     The statements in this Affidavit are based in part on information provided by

other law enforcement officers and on my investigation of this matter.  Since this Affidavit is

being submitted for the limited purpose of securing a search warrant, I have not included each

and every fact known to me concerning this investigation.  I have set forth only the facts that I

believe are necessary to establish probable cause to believe that contraband and evidence, fruits,

and instrumentalities of violations of 18 U.S.C. § 2252(a)(2) and (b)(1) (receipt or distribution of

a visual depiction of a minor engaged in sexually explicit conduct), 18 U.S.C. § 2252(a)(4)(B)

and (b)(2) (possession of and access with intent to view a visual depiction of a minor engaged in

sexually explicit conduct) and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access

with intent to view child pornography) are presently located at the SUBJECT PREMISES.

      4.     This affidavit is based upon my personal knowledge, experience and

investigation, as well as information relayed to me directly or through reports of other HSI

agents, Franklin Township Police Department detectives and other law enforcement officers

through the course of their official duties.  Throughout this affidavit, reference will be made to

"agents," referring to those federal, state and local law enforcement officers who have directly

participated in the investigation, and with whom I have had regular contact.  For simplicity, the

plural form "agents" will be used throughout this affidavit, although some observations were

made by only one agent.

## STATUTORY AUTHORITY

5.      As noted above, this investigation concerns alleged violations of the following:

a.      18 U.S.C. § 2252(a)(2) and (b)(1) prohibit any person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any visual depiction using any means or facility of interstate or foreign commerce, or that has been mailed or shipped or transported in or affecting interstate or foreign commerce, or which contains materials which have been mailed or so shipped or transported, by any means including by computer, or knowingly reproducing any visual depiction for distribution using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce or through the mails, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

b.      18 U.S.C. § 2252(a)(4)(B) and (b)(2) prohibit any person from knowingly possessing or accessing with the intent to view, or attempting or conspiring to possess or access with the intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

c.      18 U.S.C. § 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has

been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

        d.      18 U.S.C. § 2251 prohibits a person from employing, using, persuading, inducing, enticing, or coercing any minor, that is, a person under the age of 18 years, to engage in any sexually explicit conduct for the purpose of producing any visual depiction of such conduct using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or attempting to do so.

## DEFINITIONS

        6.      The following definitions apply to this Affidavit and Attachment B:

        a.      "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

        b.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

        c.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a

minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

      d.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices.  *See* 18 U.S.C. § 1030(e)(1).

      e.    "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

      f.    "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital

key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g.      "Geolocated," as used herein, refers to the identification of the geographical location of (a person or device) by means of digital information processed via the Internet.

h.      "Hashtag," as used herein, refers to a word or phrase preceded by a hash or pound sign (#), which is used to identify messages or groups on a specific topic.

i.      A "hash value" is a unique multi-character number that is associated with a computer file. Some computer scientists compare a hash value to an electronic fingerprint in that each file has a unique hash value. Any identical copy of the file will have exactly the same hash value as the original, but any alteration of the file, including even a change of one or two pixels, would result in a different hash value. Hash values represent large amounts of data as much smaller numeric values, so they are used with digital signatures.

j.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

k.      An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the

Internet.  Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers ("ISPs") control a range of IP addresses.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.  ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

l.      The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

m.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

n.      "Mobile application" or "chat application," as used herein, are small, specialized programs downloaded onto mobile devices, computers and other digital devices that enable users to perform a variety of functions, including engaging in online chat and sending or receiving images and videos.

o.      "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

p.      "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

q.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

r.       A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

s.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## PROBABLE CAUSE

7.      On December 4, 2023, agents were notified by school officials that a 13-year-old minor female victim ("MFV1"), a student at the Lehighton Area Middle School, Lehighton, Carbon County, Pennsylvania, had sent and received lewd photographs to an unknown party via social media.

8.      Lehighton Area Middle School Guidance Counselor Samantha Elias and other school officials including Lehighton Area School District Police Officers contacted MFV1 and

her mother (first and last name known by law enforcement), who gave them permission to review MFV1's cellular phone.

9.      Agents reviewed MFV1's Nokia C100 N152DL cellular phone. The Snapchat app was still actively logged in to account "avery_slayspop."  Agents observed a sexually explicit conversation between that account and an account with the vanity name "Love" and username "sox4269" during which "sox4269" repeatedly asked MFV1 to send pictures of her genitalia. The earliest record of this conversation was November 9, 2023.  In this Snapchat conversation agents observed MFV1 sent her Snapchat username and password to "sox4269."  Agents also observed photographs in the "trash" folder of the cellular phone's camera roll.  Among these were photographs of MFV1 and photographs of nude female genitalia.

10.     On December 7, 2023, agents applied for and were granted search warrants in Carbon County, Pennsylvania for Snapchat accounts "avery_slayspop" and "sox4269" for the period of November 9, 2023, to December 4, 2023.  On December 13, 2023, Snap, Inc. provided agents with the information pursuant to the search warrant.

11.     Agents reviewed internet protocol ("IP") addresses used to log into both the "avery_slayspop" and "sox4269" Snapchat accounts and found both accounts had been logged into from 24.91.212.112.

12.     Agents reviewed information relative to Snapchat account "sox4269" and observed multiple nude photographs of both male and female genitalia, acts of masturbation and other acts of sexual gratification.  The account had a public profile name of "Jay".  The account was created on September 10, 2023, from the IP address 24.91.212.112 with a verified email of "joebordonaro37@gmail.com".  Geolocation data associated with this account showed activity in

the area of latitude and longitude of 42.844204, -71.1518 which is in the area of Winslow Drive, Atkinson, NH.

13.     A query of property records in Rockingham County, New Hampshire revealed Michael J. Bordonaro owns 37 Winslow Dr., Atkinson, NH.

14.     On February 9, 2024, agents submitted an additional search warrant obtained in Carbon County, Pennsylvania to Snap, Inc. for the Snapchat accounts "avery_slayspop" and "sox4269" for the period of February 23, 2023 to December 4, 2023.  On February 28, 2024, Snap, Inc. provided data pursuant to the warrant.  Upon review of this data, agents observed photos of MFV1, clothed, that had been sent from "avery_slayspop" to "sox4269".

15.     On February 12, 2024, agents submitted a search warrant obtained in Carbon County, Pennsylvania to Comcast Cable Communications for information relative to IP address 24.91.212.112 from the period of November 9, 2023, to December 4, 2023.  On February 19, 2024, Comcast Cable Communications provided agents with the requested data including:

   a.     Subscriber name: Michael Bordonaro

   b.     Subscriber address: 37 Winslow Drive, Atkinson, NH 03811-2572

   c.     Billing address: 37 Winslow Drive, Atkinson, NH 03811-2572

   d.     Telephone number: (617) 435-4768

   e.     Type of service: Internet

   f.     Account number: 8773202440058931

   g.     Account status: Active

   h.     IP Assignment: Dynamically Assigned

   i.     E-mail user IDs: bordo37@comcast.net

16.    A query of property records in Rockingham County, New Hampshire revealed Michael J. Bordonaro owns 37 Winslow Dr., Atkinson, New Hampshire.  A query of the Accurint database indicated Michael J. Bordonaro is a resident at this address.  The Accurint database also indicated that telephone number (617) 435-4768 belongs to Michael J. Bordonaro.

17.    Agents learned from the United States Postal Service that Michael, Theresa, Jaclyn, Marissa and Joseph Bordonaro have all received mail at 37 Winslow Dr., Atkinson, New Hampshire. I believe that Joseph Bordonaro is Michael J. Bordonaro's son and is currently in high school. I also believe that Joseph Bordonaro may also go by Guiseppe Bordonaro based upon the publicly available information regarding the Timberlane (Plaistow, NH) High Scholl football roster, *available at* https://www.maxpreps.com/nh/plaistow/timberlane-owls/athletes/giuseppe-bordonaro/?careerid=je2ifbg459hcc.

18.    On June 18, 2024, agents conducted surveillance of 37 Winslow Dr., Atkinson, New Hampshire.  Agents observed three vehicles parked at the residence, a white late model Ford Explorer (unknown registration) and two older model Chrysler 300s (unknown registration).

19.    A query of the NH Department of Motor Vehicles (DMV) records and the Accurint database revealed a 2020 white Ford Explorer, a white 2011 Chrysler 300C and a gray 2015 Chrysler 300C were all registered to Theresa Bordonaro of 37 Winslow Drive, Atkinson, NH. Theresa is the spouse of Michael Bordonaro.

20.    On May 16, 2024, agents conducted a forensic interview of MFV1 at the Lehighton Area Middle School.  MFV1 stated:

a.    In November 2023, MFV1 began communicating with "Jay" via Snapchat after "Jay" sent her a friend request.  "Jay" sounded nice at first.  "Jay" said he loved MFV1 and

told her that she is pretty. "Jay" told her he was 15 years old but did not reveal what school he attended. MFV1 told "Jay" she was 13 years old. MFV1 sent clothed photos of herself. "Jay" sent MFV1 a photo of himself at a gym wearing a white tank top. He had brown hair and appeared to be about 18 years old. His face was obscured by the phone he used to take the photo.

      b.    Agents showed MFV1 a screenshot of her Snapchat screen and MFV1 confirmed it was her account and username "avery_slayspop". Agents showed MFV1 a screenshot of "Jay's" account, vanity name "Love," and username "sox4269." She confirmed that was the account used by "Jay."

      c.    MFV1 said "Jay" was nice the first day they began communicating, but the next day "things got weird." Via Snapchat, "Jay" sent MFV1 a photo of his room. MFV1 looked at the photo for anything "weird" and noticed skin in the corner of the photo. "Jay" sent additional photos of the room and the skin got closer and MFV1 could see that it was his penis.

      d.    "Jay" asked MFV1 to send him pictures of herself in return. MFV1 told him she could not send him photos since her mother might find them. MFV1 relented and took pictures of her breast area, "down here," and the "back." MFV1 indicated her breast, pubic, and buttocks areas. She said she did not want to send the nude photos but did so "Jay" would leave her alone. "Jay" asked her to take pictures of herself "bending down." "Jay" asked MFV1 for her Snapchat password and told her that she could delete the photos after. "Jay" kept asking MFV1 for nude photos and she made excuses to avoid the harassment including that she was with her family. "Jay" told her to go to the bathroom so she could take photos for him. "Jay" sent her nude photos of himself to try to encourage MFV1 to send him more nude photos of

herself.   "Jay" sent MFV1 a video of himself masturbating to completion.   "Jay" told MFV1 that he would "ask her out" if she sent nude photos of herself to him.

e.       Agents showed MFV1 a screenshot of her photos in the "Trash" folder. MFV1 confirmed that the nude photos including two depicting nude female genitalia were photos of her that she had taken for "Jay."   Agents also showed MFV1 a screenshot of a Snapchat conversation in which she sent her Snapchat username and password.   MFV1 confirmed that it depicted her sending her login information to "Jay."

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

21.       I have had both training and experience in the investigation of computer-related crimes.   Based on my training, experience, and knowledge, I know the following:

a.       Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.   Computers basically serve four functions in connection with child pornography:   production, communication, distribution, and storage.

b.       Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth."   Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.   These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.       A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.   Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections.

13

Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

        d.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types - to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer - can store thousands of images or videos at very high resolution. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

        e.     The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

        f.     Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g.      A growing phenomenon related to smartphones and other mobile computing devices is the use of mobile applications, also referred to as "apps."  Apps consist of software downloaded onto mobile devices that enable users to perform a variety of tasks – such as engaging in online chat, sharing digital files, reading a book, or playing a game – on a mobile device.  Individuals commonly use such apps to receive, store, distribute, and advertise child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored.

h.      As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (*i.e*., by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional.  Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (*e.g*., temporary files or ISP client software, among others).  In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.  Such information is often maintained indefinitely until overwritten by other data.

**CHARACTERISTICS COMMON TO INDIVIDUALS WHO PRODUCE, ADVERTISE, TRANSPORT, DISTRIBUTE, RECEIVE, POSSESS, AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY**

22.      Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who distribute, receive, possess, and/or access with intent to view child pornography:

a.      Such individuals may receive sexual gratification, stimulation, and

satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.      Such individuals may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.      Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Individuals who have a sexual interest in children or images of children typically retain their pictures, films, video tapes, photographs, magazines, negatives, correspondence, mailing lists, books, tape recordings and child erotica for many years.

d.      Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly.  Some of these individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a

16

cyclical and repetitive basis.

     e.    Importantly, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices through the use of forensic tools.  Indeed, the very nature of electronic storage means that evidence of the crime is often still discoverable for extended periods of time even after the individual "deleted" it.[1]

     f.    Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses (including email addresses), and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

     g.    Such individuals prefer not to be without their child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

     h.    Even if "sox4269" uses a portable device (such as a mobile phone) to access the Internet and child pornography, it is more likely than not that evidence of this access will be found in his home, the SUBJECT PREMISES, as set forth in Attachment A, including on

---

[1] *See United States v. Carroll*, 750 F.3d 700, 706 (7th Cir. 2014) (concluding that 5-year delay was not too long because "staleness inquiry must be grounded in an understanding of both the behavior of child pornography collectors and of modern technology"); *see also United States v. Seiver*, 692 F.3d 774 (7th Cir. 2012) (Posner, J.) (collecting cases, e.g., *United States v. Allen*, 625 F.3d 830, 843 (5th Cir. 2010); *United States v. Richardson*, 607 F.3d 357, 370-71 (4th Cir. 2010); *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010)).

digital devices other than the portable device (for reasons including the frequency of "backing up" or "synching" mobile phones to computers or other digital devices).

## **SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS**

23.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found.  One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

24.    I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons:

a.    Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not

18

actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

        c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

        d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

     25.     As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when, in connection with the violations listed in this affidavit.  There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

        a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online

nicknames and passwords. Operating systems can record additional information, such as the

attachment of peripherals, the attachment of USB flash storage devices or other external storage

media, and the times the computer was in use. Computer file systems can record information

about the dates files were created and the sequence in which they were created, although this

information can later be falsified.

      b.     Information stored within a computer and other electronic storage media

may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

conduct under investigation, thus enabling the United States to establish and prove each element

or alternatively, to exclude the innocent from further suspicion. In my training and experience,

information stored within a computer or storage media (*e.g.*, registry information,

communications, images and movies, transactional information, records of session times and

durations, Internet history, and anti-virus, spyware, and malware detection programs) can

indicate who has used or controlled the computer or storage media. This "user attribution"

evidence is analogous to the search for "indicia of occupancy" while executing a search warrant

at a residence. The existence or absence of anti-virus, spyware, and malware detection programs

may indicate whether the computer was remotely accessed, thus inculpating, or exculpating the

computer owner. Further, computer and storage media activity can indicate how and when the

computer or storage media was accessed or used. For example, computers typically contain

information that logs computer user account session times and durations, computer activity

associated with user accounts, electronic storage media that connected with the computer, and

the IP addresses through which the computer accessed networks and the Internet. Such

information allows investigators to understand the chronological context of computer or

electronic storage media access, use, and events relating to the crime under investigation.

Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (*e.g.*, a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (*e.g.*, Internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a

21

computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

       e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

       f.     I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

      26.     Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.  I also know that during the search of the premises it is not always

possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a.      Searching computer systems is a highly technical process that requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, or operating system that is being searched;

b.      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d.      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear

23

that the file contains text.  Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened.  Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

## BIOMETRIC ACCESS TO DEVICES

27.     This warrant permits law enforcement to compel Michael Bordonaro and Joseph Bordonaro to unlock any devices requiring biometric access subject to seizure pursuant to this warrant.  The grounds for this request are as follows:

a.      I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.      If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant

24

finger to the device's Touch ID sensor, which is found in the round button (often referred to as

the "home" button) located at the bottom center of the front of the device.  The fingerprint

sensors found on devices produced by other manufacturers have different names but operate

similarly to Touch ID.

          c.        If a device is equipped with a facial-recognition feature, a user may

enable the ability to unlock the device through his or her face.  For example, this feature is

available on certain Android devices and is called "Trusted Face."  During the Trusted Face

registration process, the user holds the device in front of his or her face.  The device's front-

facing camera then analyzes, and records data based on the user's facial characteristics.  The

device can then be unlocked if the front-facing camera detects a face with characteristics that

match those of the registered face.  Facial recognition features found on devices produced by

other manufacturers have different names but operate similarly to Trusted Face.

          d.        If a device is equipped with an iris-recognition feature, a user may enable

the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices,

this feature is called "Windows Hello."  During the Windows Hello registration, a user registers

his or her irises by holding the device in front of his or her face.  The device then directs an

infrared light toward the user's face and activates an infrared-sensitive camera to record data

based on patterns within the user's irises.  The device can then be unlocked if the infrared-

sensitive camera detects the registered irises.  Iris-recognition features found on devices

produced by other manufacturers have different names but operate similarly to Windows Hello.

          e.        In my training and experience, users of electronic devices often enable

the aforementioned biometric features because they are considered to be a more convenient way

to unlock a device than by entering a numeric or alphanumeric passcode or password.  Moreover,

in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

   f. As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

   g. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or (2) when the device has not been unlocked using a fingerprint for 8 hours *and* the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

   h. Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the

aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of Michael Bordonaro and Joseph Bordonaro to the fingerprint scanner of the devices found at the SUBJECT premises or on her person; and/or (2) hold the devices found at the SUBJECT premises or on her person in front of the face of Michael Bordonaro and Joseph Bordonaro and activate the facial recognition feature or the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to request that Michael Bordonaro and Joseph Bordonaro state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to ask Michael Bordonaro and Joseph Bordonaro to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

28.     Additionally, based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that routers, modems, and network equipment used to connect computers to the Internet often provide valuable evidence of, and are instrumentalities of, a crime. This is equally true of wireless routers, which create localized networks that allow individuals to connect to the Internet wirelessly. Though wireless networks may be secured (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or unsecured (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing

logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network. Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

29.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

30.    Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the contraband, property, evidence, fruits, and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A.  I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

31.    I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process.  For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises.  Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

/s/ John Arruda
John Arruda
Special Agent
Homeland Security Investigations

Sworn to me by telephone in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure
on this _____16th_____ day of August, 2024.

HONORABLE ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

29

**<u>ATTACHMENT A</u>**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

37 Winslow Drive, Atkinson, NH 03811 (the SUBJECT PREMISES) is a two and a half story single family residence.  The house is yellow with white trim, three white dormers, and a gray roof.  The SUBJECT PREMISES is pictured below.



This warrant also authorizes the search of the following individuals located at the SUBJECT PREMISES: Michael J. Bordonaro and Joseph Bordonaro a/k/a Guiseppe Bordonaro.  In

30

addition, the warrant specifically authorizes the search of computers or storage media seized

pursuant to Attachment B.

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use, or which is or has been used as the means of committing a criminal offense, namely violations of 18 U.S.C. § § 2252 and 2252A:

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which are stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

   a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

   b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   c. evidence of the lack of such malicious software;

   d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to the crime(s) under investigation and to the computer user;

    e.   evidence indicating the computer user's knowledge and/or intent as it relates to the crime(s) under investigation;

    f.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    g.   evidence of programs (and associated data) that are designed to eliminate data from the COMPUTER;

    h.   evidence of the times the COMPUTER was used;

    i.   passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

    j.   documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    k.   records of or information about Internet Protocol addresses used by the COMPUTER;

    l.   records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

    m.  contextual information necessary to understand the evidence described in this attachment.

3.  Routers, modems, and network equipment used to connect computers to the Internet.

4.  Child pornography, as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2), and child erotica.

5.  Records, information, and items relating to violations of the statutes described above including:

    a.  Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES, 37 Winslow Drive, Atkinson, NH 03811, including utility and telephone bills, mail envelopes, or addressed correspondence;

    b.  Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

    c.  Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

    d.  Records and information relating to the sexual exploitation of children, including correspondence and communications between Snapchat users;

    e.  Records and information showing access to and/or use of Snapchat; and

    f.  Records and information relating or pertaining to the identity of the person or persons using or associated with "sox4269"

During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of Michael Bordonaro and Joseph Bordonaro, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media

34

that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.